622 F.2d 1147
 HOWE, Donald D., Appellant,
v.
ALLIED VAN LINES, INC.
HILL, Jerry P., Appellant,
v.
TRANS-AMERICAN VAN SERVICE, INC.
FARIS, James R.
v.
AERO MAYFLOWER TRANSIT CO., INC.
v.
UNITED STATES of America, 3rd Party Defendant,
United Services Automobile Association, Appellant.
BILLITER, James H.
United Services Automobile Association
v.
WHEATON VAN LINES, INC.
United Services Automobile Association, Appellant.
DeFRANK, Dale
v.
PYRAMID VAN LINES, INC.
Dale A. DeFrank, Appellant.
FOLEY, Norman R., Appellant,
v.
AMERICAN RED BALL TRANSIT CO., INC.
CEVALLOS, Henry, Appellant,
v.
VANPAC CARRIERS, INC.
v.
CLEMMER MOVING & STORAGE, INC.
BLASE, William E. and United Services Automobile
Association, Appellants,
v.
NATIONAL VAN LINES, INC., Defendant and Third Party Plaintiff,
v.
UNITED STATES of America, Third Party Defendant.
MADONNA, Donald E., Appellant,
v.
RICHARDSON TRANSFER AND STORAGE CO., INC.
WILKERSON, Glenn D., Appellant,
v.
ENGEL VAN LINES, INC.
v.
UNITED STATES of America
James R. ACREBACK, United Services Automobile Association
v.
ROCKY FORD MOVING VANS, INC., United Services Automobile
Association, Appellants.
MERKLER, George J. and Merkler, June D., Appellants,
v.
AERO MAYFLOWER TRANSIT CO., INC.
v.
UNITED STATES of America.
 Nos. 79-1857 to 79-1868.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1980.
Decided May 9, 1980.
 
 Leonard S. Wissow (argued), Joseph M. Gindhart, Wissow & Odza, Philadelphia, Pa., for appellants; Richard M. Gates, Gates, Singer & Dietsch, Rockville Centre, N.Y., Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.
 Charles Jay Bogdanoff, Gekoski & Bogdanoff, Philadelphia, Pa., for appellees Trans-American Van Service, Inc. and Richardson Transfer & Storage.
 Charles I. Richman, Ellis, Cook, Criden, Johnason, Dolan, Morrissey & Cook, Philadelphia, Pa., for appellee Pyramid Van Lines, Inc.
 Miles A. Jellinek, Cozen, Begier & O'Connor, Philadelphia, Pa., for appellee Rocky Ford Moving Vans, Inc.
 Sidney L. Wickenhaver (argued), Alison Douglas Knox, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellee Allied Van Lines, Inc.
 Reeder R. Fox, John J. Soroko (argued), Duane, Morris & Heckscher, Philadelphia, Pa., for appellee American Red Ball Transit Co., Inc.
 Denis V. Brenan, Mary E. Bretz, Philadelphia, Pa., for appellee National Van Lines, Inc.
 Arthur R. Littleton, Philadelphia, Pa., for appellee Aero Mayflower Transit Co., Inc.
 John P. Mason, Dechert, Price & Rhoads, Philadelphia, Pa., for appellee Wheaton Van Lines, Inc.
 Faustino Mattioni, Mattioni, Mattioni & Mattioni, Philadelphia, Pa., for appellees Vanpac Carriers and Clemmer Moving.
 Peter F. Vaira, U.S. Atty., Walter S. Batty, Jr., Dawn M. MacPhee, Asst. U.S. Attys., Philadelphia, Pa., for amicus curiae United States.
 Before ALDISERT and GIBBONS, Circuit Judges, and GERRY, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This litigation presents us with twelve related cases which have been consolidated for this appeal. In each case, the nominal appellant is a present or former member of the United States armed forces, and the suit is against a motor van common carrier of household goods for damage to the goods during transit. Although the record in each case does not establish the fact, it is apparent that in each case, the appeal is pressed by the casualty insurer which insured the military plaintiff against such damage. The insurer asserts a right of subrogation. All the shipments were arranged by the Department of Defense (DOD), and the carrier received the goods on a government bill of lading issued pursuant to Military Rate Tender No. 1-H, ICC No. 35 (MRT 1-H). At least 1500 common carriers of household goods have made a continuous offer under that tender to the DOD Military Traffic Management Command (MTMC) to carry household goods of service personnel at rates lower than those offered to the general public under tariffs on file with the Interstate Commerce Commission. By the terms of MRT 1-H, and the government and carrier bills of lading issued under its authority, the liability of the common carrier for loss or damage is limited to an amount equal to 60 cents per pound per article. In each case, the serviceman, whose household goods suffered damage while in transit (or his casualty insurer), contends that he should recover the actual value of the destroyed goods instead of 60 cents per pound. That contention depends, in each case, upon the applicability of the Carmack and Cummins Amendments of the Interstate Commerce Act to the carriage of these goods. See 49 U.S.C. § 20(11) (1976).[1] After cross-motions for summary judgment, the district court concluded that the provision relied upon was not controlling, and that the limitation of liability contracted for by the MTMC protected the carriers. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 Although the fact patterns in each of the cases are not identical, for the purposes of our disposition, any such differences are immaterial. For these reasons, we will confine our discussion of the relevant facts to the Howe case, which is typical.
 
 
 3
 Donald Howe, a Lieutenant Commander in the United States Navy, made arrangements for the shipment of his household goods through a representative of MTMC. Under these types of arrangements, the government offers shipment at its expense. Howe, as a member of the armed services, is entitled to this transportation benefit by virtue of federal legislation.[2] He applied for the benefit on DOD Form 1299, and signed an acknowledgment on DOD Form 1797 that he had been briefed concerning the carrier and its liability. Howe was informed that the carrier's liability would be limited to 60 cents per pound per article, and that the goods would be released by the government on a government bill of lading at that valuation. He was also advised that under a federal statute,[3] he could claim from the United States an amount up to $15,000 for any uninsured loss,[4] and that, if he desired, he could also purchase additional insurance. Howe did purchase additional insurance in the amount of $25,000 from United Services Automobile Association, a private insurance company that specializes in insurance for military personnel.
 
 
 4
 Allied Van Lines, on April 26, 1977, accepted Howe's household goods under a government bill of lading which designated the United States Naval Academy as the shipper and Howe as the consignee. On July 5, 1977, Allied's van overturned and 10,730 pounds of Howe's belongings were destroyed. Allied contends that under the bill of lading its liability is limited to $6,438.22, while Howe and the insurer contend that Allied is liable for the actual value of the goods, which is estimated to be about $35,000. Howe has received payment from the insurer, and presumably has received or can receive payment from the United States for any difference between the amount received from the insurer and the $6,438 owed by Allied. Thus, it is clear that the major portion of any recovery sought from Allied in excess of $6,438, would be for reimbursement of the insurer. The United States acknowledges that it is bound by the limitation of liability in the government bill of lading, and has no subrogation claim. It contends, as well, that the limitation of liability binds Howe, the consignee, and those in privity with him. The fact pattern of all the cases is similar, although in some of the cases it is possible that the serviceman, as well as the insurer, has an interest in any possible recovery.
 
 II. THE THEORY OF LIABILITY FOR FULL VALUE
 
 5
 The theory of recovery is that the 60 cent per pound limitation of liability in the government bill of lading is illegal and void under section 20(11) of the Interstate Commerce Act, which in relevant part provides:
 
 
 6
 Any common carrier . . . receiving property for transportation . . . shall issue a receipt or bill of lading therefor, and (1) shall be liable to the lawful holder thereof for any loss, damage, or injury to such property . . . and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability imposed; and any such common carrier . . . shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon . . . (2) for the full actual loss, damage, or injury to such property . . . (3) notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading . . . or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void: . . . Provided, however, (4) That the provisions hereof respecting liability for full actual loss, . . . notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, . . . to property . . . received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property . . .; (5) and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the commission is empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation.
 
 
 7
 49 U.S.C. § 20(11).
 
 
 8
 Plaintiff reads section 20(11) as a plain prohibition ((3)) against a limitation of liability for less than full value ((2)) unless the ICC has approved a released value order ((4)) and the carrier has filed an approved tariff schedule reflecting a reduced rate approved by the ICC. It contends that there was no ICC released value order ((4)) approving the 60 cent per pound limitation in MRT 1-H 9, and that there was no filed approved tariff schedule ((5)) establishing a rate for such reduced liability. Since Howe and the other servicemen are lawful holders of the government bills of lading, they and their insurer contend that, under section 20(11), the limitation of value is unlawful and void. If section 20(11) governs, and has not been complied with, the logic of the plaintiff's position seems inescapable.
 
 
 9
 With respect to the rates charged to the general public, the motor carriers do not contend that they are free to contract for a limited liability based upon an agreed reduced value of goods received. The carriers agree that under section 20(11) they must obtain a released value order, and file an approved tariff schedule reflecting any rate that is different from that charged to other shippers. They do urge, however, that they substantially complied with section 20(11) because their tender to the government, MRT 1-H, was filed with the ICC. But their primary contention, with which the United States as amicus agrees, is that section 20(11) does not govern their dealings with the government-as-shipper. In support of their argument, both the motor carriers and the United States point to section 22 of the Interstate Commerce Act, which in relevant part provides:
 
 
 10
 Nothing in this chapter shall prevent the carriage . . . of property free or at reduced rates for the United States, State or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat . . .
 
 
 11
 49 U.S.C. § 22 (1976).
 
 
 12
 The motor carriers and the government contend that section 22 authorizes the United States to enter into agreements with carriers, which are otherwise subject to the Interstate Commerce Act, at reduced transportation rates with concomitant limitations of liability. They urge that the freedom of contract which the United States enjoys by virtue of section 22 is an exception to the general antidiscrimination thrust of the Act. And, therefore, since section 20(11) is one of the sections that promotes this antidiscrimination purpose, they are exempted from its requirements.
 
 
 13
 III. THE INAPPLICABILITY OF SECTION 20(11) TO GOVERNMENT ARRANGEMENTS PURSUANT TO SECTION 22
 
 
 14
 For present purposes we accept as correct, without deciding, the plaintiffs' contention that they are "holders" of these government bills of lading and that therefore they fall within the terms of the limitation of liability protections in section 20(11). We also assume, arguendo, that the plaintiffs are correct in their contention that strict, not merely substantial, compliance with that section is required before a carrier to which it applies can claim the protection of a contractual limitation of liability.[5] However, since the plaintiffs' rights as "holders" are no greater than those of the consignor (United States), to whom the bill of lading was issued, we must first consider the contention that section 20(11) is inapplicable to government bills of lading by virtue of section 22. We conclude that both history and policy support that construction of section 22.
 
 A. The Background of Section 22
 
 15
 The language of section 22, quoted above, has been a part of the Interstate Commerce Act from the date of the Act's first passage on February 4, 1887. See Act of February 4, 1887, ch. 104, § 22, 24 Stat. 387.[6] But its antecedents are even older. The issue of federal regulation of interstate railroads had been the subject of congressional debate for more than twenty years prior to the Act. The 1887 enactment was the culmination of these debates. Previously, a provision similar to section 22 had been included in other proposed bills[7] on which the Senate and the House had failed to agree.[8]
 
 
 16
 The unsuccessful proponents of federal railroad regulation were not writing, however, on a clean slate with respect to their attempt to exempt government contracts from the general coverage of the act. The subject had already been addressed in the Act of June 15, 1866, ch. 124, § 1, 14 Stat. 66 (1866). This was the first railroad statute passed pursuant to commerce clause powers. It was precipitated by the New Jersey statutory grant of a monopoly to the Camden & Amboy Railroad of the traffic between New York and Philadelphia.[9] The act authorized all railroads to carry through traffic and to interconnect with other lines. Congress thus intended to eliminate this monopoly by imposing this interconnection principle on all railroads. The act contained the proviso "(t)hat this act shall not affect any stipulation between the government of the United States and any railroad company for transportation or fares without compensation, nor impair or change the conditions imposed by the terms of any act granting lands to such company . . . ." 14 Stat. 66. This reference to "any act granting lands to such company" is the key to the understanding of the "shall not apply" language in the original section 22.
 
 
 17
 Most railroad companies, whether chartered by the states or built pursuant to federal legislation, were the recipients of various forms of public support for which the government sought a quid pro quo of more favorable treatment.[10] This treatment of the railroads was consistent with the earlier treatment of canal companies which received government support.[11] By 1866, the land grant acts stated in fairly specific terms exactly what favorable treatment the government expected. A land grant act in 1866 is particularly illustrative and significant:
 
 
 18
 That the grants aforesaid are made upon the condition that the said companies shall keep said railroad . . . in repair and use, and shall at all times transport the mails, . . . for the . . . United States, . . . and that the government shall at all times have the preference in the use of said railroad . . . at fair and reasonable rates . . . not to exceed the rates paid by private parties . . . . And said railroad shall be and remain a public highway for the use of the government of the United States, free of all toll or other charges upon the transportation of the property or troops of the United States; and the same shall be transported over said road at the cost, charge, and expense of the corporations or companies owning or operating the same, when so required by . . . the United States.
 
 
 19
 Act of July 25, 1866, ch. 242, § 5, 14 Stat. 240-41 (1866). Some members of Congress assumed that these conditional land grants provided for exactly what they stated: the government was entitled to free transportation for its property and troops from those railroads which had received the land grants. In 1874, Congress attempted to enforce the free transportation provisions and accordingly prohibited the use of army appropriations to be paid for these expenses. Act of June 16, 1874, ch. 285, 18 Stat. 74. The Supreme Court disagreed with Congress's interpretation of its own legislation, and held in Atchison, Topeka & S. F. Co. v. United States, 93 U.S. (3 Otto) 442, 23 L.Ed. 965 (1876), that such statutory provisions applied to tolls, not to transportation charges. The railroads were, by then, sufficiently well-connected in Congress that the decision was not overturned by subsequent legislation. But, Congress did continue to insist that the beneficiaries of its land grants do business with the United States at reduced rates.[12]
 
 
 20
 Congress was certainly aware in 1887, when it passed the Interstate Commerce Act, of its own statutes that required preferential treatment. Numerous states have also enacted similar preferential legislation.[13] To understand why it was necessary for Congress to exempt governmental business from coverage of the Interstate Commerce Act, it must be recognized that the primary feature of that Act was to prohibit "any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever . . . ." Interstate Commerce Act of 1887, ch. 104, § 3, 24 Stat. 380. Thus if the governmental exception, embodied in section 22, had not been included in the Act, a large number of federal and state statutes providing for preferences or advantages to governmental traffic would have been repealed.
 
 
 21
 However, the real concerns of the 1887 Congress did not involve governmental traffic. The aforementioned stalemate between the House and the Senate over federal railroad regulation finally came to an end in 1887 with the passage of the Act, because of the coincidental occurrence of two events. One was the decision of the Supreme Court in Wabash St. L. & Pac. Ry. Co. v. Illinois, 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886). In that case, the Court held that the 1870 Illinois statute prohibiting discrimination between long haul and short haul shippers was, under the commerce clause, unconstitutional. The other precipitating event was the disclosure of evidence that the Standard Oil Company had conspired with railroads in Western Pennsylvania; it was intended that the railroads would charge higher rates for transportation of Pennsylvania crude to refineries in Pittsburgh than for transportation to Standard's refinery in Cleveland.[14] Further investigation by congressional committees revealed that five leading railroads had been part of a conspiracy to monopolize the petroleum trade. It was the railroad's ability to charge various rates that enabled them to effect anticompetitive policies. In 1887, Congress was interested in the elimination of the discrimination in favor of classes of private shippers, and not in the elimination of a longstanding legislative judgment that the government could insist upon such discrimination.
 
 
 22
 The early history of section 22 compels the conclusion that Congress intended to preserve the federal government's power to bargain with carriers, or to impose upon carriers preferential rates and terms free of the antidiscrimination prohibitions of the Interstate Commerce Act, and free of regulation by the Commission which the Act created. Subsequent amendments to section 22 do not indicate any intention on the part of Congress to eliminate this right of the federal government to make its own arrangements.
 
 
 23
 The first several changes in the section consisted of the addition of new classifications for which reduced rates would be allowed if the carrier decided to offer such rates. For example, the Act of March 2, 1889, ch. 382, § 9, 25 Stat. 862, which also changed the wording from "apply" to "prevent", added destitute, homeless and indigent persons, persons from National or State Homes, and soldiers to the list. Similarly, blind persons accompanied by a guide were added to section 22 in the Act of February 26, 1927, ch. 217, 44 Stat. 1247-48, and the reduced rate exception was extended to transportation of property to or from parts of the country with the object of providing relief from earthquakes, floods, fires, and other such disasters. See Act of March 4, 1927, ch. 510, § 1, 44 Stat. 1446-47. In 1934, an exception was added for improving nationwide housing, as specified by the Commissioner, see Act of June 27, 1934, ch. 847, § 511, 48 Stat. 264, but was repealed in 1940. See Act of September 18, 1940, ch. 722, § 3, 54 Stat. 900-901. Other minor changes were made by the 1940 Act. During the intervening years, motor carriers were added to the Act. See Motor Carrier Act of August 9, 1935, ch. 498, 49 Stat. 543, 563, seeing eye dogs were subsequently allowed for blind persons, see Act of July 5, 1937, ch. 432, 50 Stat. 475, and additional relief for disasters when authorized by the Commission (with or without a hearing). See Act of August 25, 1937, 50 Stat. 809.
 
 
 24
 It wasn't until 1957 that a significant change relevant to this litigation was proposed but not adopted. In that year, the Senate Committee on Interstate and Foreign Commerce recommended an amendment to section 22. The bill was directed to the first clause of the act under which the United States, state, and municipal governments were allowed reduced rates. The bill proposed to limit the granting of such rates to times of war or national emergency.
 
 
 25
 The Senate report on this proposal discusses the various positions of the bill's proponents and opponents. The following excerpts are relevant to Congress's understanding of the scope of the section.
 
 
 26
 The Interstate Commerce Commission advocates amendment of section 22 as indicated in this bill on the ground that the reduced rates so obtained have a strong tendency to increase the cost of regulated transportation.
 
 
 27
 Leading advocates of repeal are members of the motor carrier industry. . . . It is argued that it is unfair to the commercial shipper to allow the government to move its traffic without regulation because under this policy the various levels of government obtain low rates that must be subsidized, or the difference made up by commercial shippers in the form of higher rates to them.The railroads generally contend that as long as unregulated means of transportation are available to the government . . . that section 22 should be available to the railroads to allow them to compete for government business.
 
 
 28
 The Department of Defense does not favor passage of S. 939. Its representative pointed out . . . that the Department . . . deems it imperative that it continue to have the means for obtaining quick action on rate adjustments now available under section 22. The usual rate bureau procedure for obtaining such adjustments is considered too slow to meet the Department's needs.
 
 
 29
 S.Rep.No.410 (June 6, 1957), reprinted in (1957) U.S.Code Cong. & Admin.News, pp. 1782, 1783-84 (emphasis added).
 
 
 30
 The discussion is, in a large part, a comparison of the commercial regulated traffic with the unregulated government transportation. The report presumes that government traffic is unregulated and that the determination of its rates and regulations is not subject to normal ICC procedures. Significantly, the Department of Defense suggested that "section 9 of S. 1457, 85th Congress, be substituted. That section would make rates on government traffic subject to all provisions of the Interstate Commerce Act, including the requirements for filing and public inspection, except the long-and-short-haul clause and the terms of the act providing for suspension of rates." (1957) U.S.Code Cong. & Admin.News at 1784. This proposal itself indicates that the government at that time was not subject to the other provisions. The Report recommends legislation in lieu of S. 939 which essentially is a compromise between the different proposals urged by various carriers and various government agencies. (The federal agencies could not agree among themselves about S. 939).
 
 
 31
 The amendment to section 22 that was passed reflects a balancing between the government's need for flexibility, particularly with respect to matters of defense, the carriers desire to repeal the exception, and the need, as the committee saw it, for section 22 quotations to "be made available for public scrutiny. Rates for Government traffic, like other business transactions of the Government, are, in the absence of compelling reasons to the contrary, best handled in the daylight of complete publicity. Requirement for such action is deemed necessary here." Id. at 1786. So, in rejecting the original version of S. 939, a new paragraph was suggested which "would require carriers to submit to the Interstate Commerce Commission copies of section 22 quotations simultaneously with their submittal to the agencies and departments of the United States Government. The Commission would not have any regulatory authority over rates made under section 22, but would be required to make section 22 tenders or quotations available for public examination." Id. (emphasis added).
 
 
 32
 The 1957 Congressional activity resulted in the requirement that copies of quotations (MRT 1-H) to the United States government be filed with the Interstate Commerce Commission for informational purposes, and open for public inspection. See 49 U.S.C. § 22(2). Neither the text of the 1957 amendment nor its legislative history suggest any departure by Congress from the decision made in 1887 that the federal government, despite the passage of the Act, remained free to contract with common carriers on its own terms. Indeed, a departure from that policy was expressly rejected in 1957.
 
 
 33
 Not directly in point, but nevertheless relevant to an understanding of section 22, are the exceptions for certain classes of passengers to the "free pass" prohibition found in section 1(7) of the Act, 49 U.S.C. § 1(7).[15] That section is aimed at prohibiting non-excepted passes because they operate, in effect, as unjust discrimination. The "free pass" prohibition was not enacted by Congress until 1906, but those persons excepted from the "free pass" prohibition are similar to those excepted in section 22. Commentators have noted that the two sections must be cross-referenced[16] because they embody a common purpose.[17] The correlation between the "reduced" fare and a limitation on liability has been recognized; limitations on carrier liability in free passes made pursuant to the Act have been consistently upheld.[18]
 
 B. The Background of Section 20(11)
 
 34
 The plaintiffs acknowledge that section 22 appears to reserve to the federal government the right to contract with common carriers on its own terms. They contend, however, that section 22 had no bearing upon the issue of carrier liability. Apparently, they regard that issue as completely unrelated to section 22 rights, and instead, urge that the matter has been dealt with comprehensively and preemptively in section 20(11).
 
 
 35
 The evolution of section 20(11) illustrates very different policies than the legislative history of section 22. The first version of section 20(11) was the Carmack Amendment of the Hepburn Act. See Act of June 29, 1906 (Hepburn Act), ch. 3591, § 7, 34 Stat. 593. The Carmack Amendment was Congress's reaction to the decision in Pennsylvania R. R. Co. v. Hughes, 191 U.S. 477, 24 S.Ct. 132, 48 L.Ed. 268 (1903).[19] According to the Hughes Court, the Interstate Commerce Act of 1877 did not provide any guidance on the issue of carrier liability, and that, instead, state law controlled. However, the 1887 Act had carried forward the carrier interconnection principle which first appeared in the Act of June 15, 1866, ch. 124, § 1, 14 Stat. 66 (1866). It was for this reason that the Hughes case created a problematic situation: the lawful holder of a bill of lading would have to identify and locate the interconnecting carrier actually responsible for the loss. This was often an impossibility.[20] Thus under the Carmack Amendment, and therefore a uniform federal standard, the initial carrier, which issued the bill of lading, was made responsible not only for the damage which it caused but also for any damage caused by an interconnecting carrier.
 
 
 36
 In Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913), the Court construed the Carmack Amendment to be only an adoption of the common law rule that a common carrier may not contract itself out of liability for negligence. However, under state common law, a carrier could contract for a limited valuation of goods. Thus, the Court held that under state law, which had not been preempted by the Amendment, it was lawful for a carrier to limit its exposure to liability. The Adams Express holding introduced the possibility that common carriers could discriminate among shippers by offering reduced rates in exchange for real or imaginary limitations in declared value. In 1915, Congress reacted to this situation, and passed the First Cummins Amendment to the section. See Act of March 4, 1915, 38 Stat. 1196. It provided that a carrier could contract to limit liability as to valuation only if the goods were hidden from view by wrapping, boxing, or other means. In such a case, the carrier and the shipper could agree on a declared value, and the shipper could obtain a reduced rate dependent on value, but only if such reduced rates were filed with the Interstate Commerce Commission in advance.
 
 
 37
 Finally, in 1916, as a result of a Commission construction of the 1915 Amendment,[21] Congress passed the Second Cummins Amendment.[22] The purpose of this amendment was to restore the rule of liability for full value as it had previously existed. The Commission could establish rates which varied with the value of the property declared or agreed upon. A limitation of liability was allowed if expressly authorized by the Commission. These released values were to be filed, as rates were, with the Commission. The Second Cummins Amendment contained all the relevant language of the current section 20(11).[23] As we view the legislative evolution of section 20(11), we discern three aspects. First, Congress in the Carmack Amendment in 1906 federalized, and thus made uniform, the law of common carrier liability in interstate commerce transactions. Next, in the First Cummins Amendment, Congress endorsed one of the aspects of the Adams Express interpretation of the Carmack Amendment: a carrier could not contract out of negligence absolutely, but it could contract for a rate reflecting a declared value of the goods shipped. Third, Congress recognized that to allow private parties to contract for special rates based upon declared values would open the door to discrimination. Thus, Congress made such contracts the subject of filed tariffs, and thus of the filed tariff rule.[24] We must decide how each of these aspects bears upon the federal government's pre-existing section 22 power to do business with carriers on its own terms.
 
 
 38
 The first aspect of section 20(11) is, we think, irrelevant for present purposes. In 1906, Congress probably did not have in mind the protection of the federal government from the vagaries of state law, and from carrier contracts that exculpated the carrier from negligence. Congress' basic position was reflected in section 22: the federal government could deal with carriers on whatever terms it bargained for. But, even if we assume that the 1906 legislation was intended to benefit the United States, that aspect of section 20(11) is not in issue. The government bills of lading in this case did not exculpate the carriers from their own negligence, and no one suggests that we should look elsewhere but to federal law.[25]
 
 
 39
 The second aspect of section 20(11) is equally irrelevant. The First Cummins Amendment endorsed the concept of the Adams Express rule that a shipper and a carrier could contract for a limitation on liability tied to the declared value of the goods. The endorsement of this concept neither added to nor subtracted from the pre-existing authority of the federal government, recognized in section 22, to contract in exactly that manner if federal officials so desired.
 
 
 40
 The third aspect of section 20(11), the requirement that shipper-carrier agreements be made only pursuant to approved filed tariffs, is the only possibly relevant aspect. The question is a narrow one: did Congress, when it brought agreements as to declared value of shipments within the antidiscrimination coverage of the Interstate Commerce Act, intend to modify the longstanding policy that the federal government was not bound by the antidiscrimination principle. There is no evidence of any such intention in 1915, or in 1916, or at any time since.
 
 
 41
 The plaintiffs contend that section 22 is solely a rate section, while section 20(11) is solely a carrier liability section, and thus each section must govern exclusively on the separate issues. They urge that the federal government is free under section 22 to negotiate for discriminatory rates, but is bound under section 20(11), like private shippers, by the prohibition against contractual limitations on liability unless, of course, it has fully complied with the released value exception. But section 20(11) itself recognizes the interrelationship between the declared value of property and the rate charged for carriage. According to that section, a shipper who chooses to self-insure for any excess over the declared value is entitled to a reduction in rate, since the carrier is thereby relieved of a portion of the risk that it would otherwise be responsible for. The amount of the reduction must be determined, however, in accordance with an approved filed tariff, in order to prevent favored shippers from using the self-insurance device as a method of exacting rate discriminations. A government shipper, exempted under section 22, who agrees to a declared value, similarly acts as a self-insurer in order to seek a rate concession to relieve the carrier of part of the risk of loss. Thus, since a government shipper may lawfully exact a discriminatory rate, there is no reason to require adherence to the antidiscrimination released value provisions of section 20(11).
 
 C. Caselaw On Government Bills of Lading
 
 42
 Few cases have been called to our attention dealing expressly with the applicability of section 20(11) to a government bill of lading. The case which gives the plaintiffs the greatest comfort is Anton v. Greyhound Van Lines, 591 F.2d 103 (1st Cir. 1978). On facts similar to those presented here, the court held that a carrier was liable to a serviceperson for full value of goods damaged in transit because it had not complied with the released value requirements of section 20(11). The court mistakenly refers to the military person as the shipper, although it seems clear that the goods were, as here, shipped on a government bill of lading at a declared value of 60 cents per pound pursuant to a general tender to the DOD. No mention is made in the opinion of section 22, and apparently it was not called to the court's attention. Had it been, we are confident that the result in Anton would have been different.
 
 
 43
 No other cases on which the parties rely are particularly helpful. In Rocky Ford Moving Lines, Inc. v. United States, 501 F.2d 1369 (8th Cir. 1974), the court enforced the 60 cent per pound limitation of liability, but did not clearly disclose whether its decision rested upon a section 22 exemption or upon substantial compliance with section 20(11). In Fort Worth & Denver R.R. Co. v. United States, 242 F.2d 702 (5th Cir. 1957), the court held that the carrier was liable to the United States for full value because neither the section 22 quotation nor the bill of lading contained a lower declared value. 242 F.2d at 705.
 
 
 44
 In C & H Transp. Co. v. United States, 436 F.2d 480, 193 Ct.Cl. 872 (1971), the government argued that the section 22 tender (which contained no released value provision) governed. The carrier contended that the section 22 quotation incorporated by reference the carrier's published tariff regulations and released values. The court held for the government. Although the court recognized that a section 22 rate was exclusive, it did not mention section 20(11).[26]
 
 
 45
 In a similar context, section 22 quotations were recognized as lawfully published and filed with the commission, although not approved. See Atchison, Topeka & S. F. R. Co. v. United States, 572 F.2d 843 (Ct.Cl. 1978). Apparently, the court viewed publication and filing as the only necessary elements for section 22 rates. However, the court did not discuss the applicability of section 20(11).
 
 
 46
 Finally, plaintiffs rely on dicta in Hughes Transp. Co. v. United States, 121 F.Supp. 212, 128 Ct.Cl. 221 (1954), which was vacated, and summary judgment was granted to the government for other reasons in a subsequent decision.[27] 168 F.Supp. 219, 144 Ct.Cl. 200 (1958), cert. denied, 359 U.S. 968, 79 S.Ct. 879, 3 L.Ed.2d 835 (1959). To the extent that the Hughes opinion tends to support plaintiffs' version of the interaction between sections 20(11) and 22, we find it unpersuasive.
 
 
 47
 This is, so far as we can tell, the first case which has considered whether the Carmack and Cummins Amendments require Interstate Commerce Commission approval of declared value limitations in government tariffs and bills of lading. As indicated above, we think the government is free to contract for declared value limitations without such approval.
 
 D. Policy Considerations
 
 48
 The government's shipment of household goods is a massive operation and is part of a comprehensive compensation plan for the military. See 37 U.S.C. § 406(b). The government has elected to act as a self-insurer for the excess of value over 60 cents per pound, upon the reasonable belief that by doing so, it will obtain more favorable rate quotations from the common carriers of household goods. It is undisputed that the DOD need not have Interstate Commerce Commission approval for the solicitation and acceptance of tenders for carriage. There is no feasible method to separate the component of a tendered rate reflecting risk of loss from the rest of the tender. Thus, as a practical matter, either all aspects of tenders to the government should be made subject to the Commission's approval jurisdiction or none should be. Congress chose in 1957 to continue the policy, adopted in 1887, of allowing the federal government to bargain freely for preferential treatment. Moreover, it is not unreasonable to assume that the government, as a shipper, has sufficient strength to reach a fair bargain. In light of the close relationship between rates and declared values, it would be unrealistic to interpret the Act as imposing partial coverage.
 
 IV. JUDGMENT
 
 49
 Our conclusion that section 20(11) does not apply to government bills of lading suffices to sustain the judgment in favor of the defendants for any amounts in excess of 60 cents per pound. That being so, we have no occasion to discuss other contentions advanced in support of that judgment. In eleven cases, No. 79-1857, 79-1858, 79-1859, 79-1860, 79-1861, 79-1862, 79-1863, 79-1864, 79-1865, 79-1867, and 79-1868, the plaintiffs also urge that the court erred in omitting interest from the date of loss to the date of judgment. That point is not fully developed in the brief for the plaintiffs, and is responded to only in the brief filed in No. 79-1857 on behalf of Allied Van Lines.
 
 
 50
 Allied made a $2500 unconditional tender to Howe on July 7, 1977, which was rejected. It contends that the unconditional tender stopped the running of interest on that amount. We agree. As to the remaining balance, interest was allowed. In the other cases, the briefs fail to offer any information on how the amount of the judgment was calculated. But our examination of the record suggests that in those instances in which judgments were entered in favor of the plaintiff, on the assumption that 60 cents per pound was due, the amount of the judgment was agreed upon. Thus we will affirm the judgments of the district court in all cases.
 
 
 
 *
 Hon. John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 Congress recently repealed the sections of the Interstate Commerce Act at issue in this case in an Act to revise, codify and enact without substantive change the Interstate Commerce Act as subtitle IV of title 49, United States Code, "Transportation." Act of October 17, 1978, Pub.L. No. 95-473, § 1, 92 Stat. 1337. The Act is codified at 49 U.S.C. §§ 10101-11916 (1978). However, since this case arose before the recodification and was litigated under the prior version, we will also use the earlier sections for ease of presentation
 
 
 [2]
 See 37 U.S.C. § 406 (1976)
 
 
 [3]
 See 31 U.S.C. §§ 240-243 (1976)
 
 
 [4]
 See id. at § 241(b)
 
 
 [5]
 See New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 134-35, 73 S.Ct. 986, 989-990, 97 L.Ed. 1500 (1953) (to limit liability in accordance with statutory exception, there must be agreement in writing between shipper and carrier to that effect); American Ry. Express Co. v. Lindenburg, 260 U.S. 584, 589-90, 43 S.Ct. 206, 208, 67 L.Ed. 414 (1923) (Cummins Amendment requires express authorization of ICC to maintain rates dependent upon value declared and agreed to as the released value, but statute does not require signature of shipper); Glickfeld v. Howard Van Lines, 213 F.2d 723, 725 (9th Cir. 1954) (discussing statutory requirement for released values); Caten v. Salt City Movers & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945); Semi-Metals, Inc. v. Pinter Bros., 70 N.J. 437, 360 A.2d 385, 387 (1976) (discussing requirements of section 20(11))
 
 
 [6]
 The original version of section 22 states (emphasis added):
 Section 22. That nothing in this act shall apply to the carriage, storage, or handling of property, free or at reduced rates for the United States, State, or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the issuance of mileage, excursion, or commutation passenger tickets; nothing in this act shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion; nothing in this act shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employees; and nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies: Provided that no pending litigation shall in any way be affected by this act.
 We note that, in this original version, the first clause states flatly that the act shall not "apply." The later version, instead, uses the word "prevent." Compare Act of February 4, 1887, ch. 104, § 22, 24 Stat. 387 with 49 U.S.C. § 22 (1976). Apparently, the wording was changed inadvertently in the Act of March 2, 1889, ch. 382, § 9, 25 Stat. 862 (1889).
 
 
 [7]
 See H.R.No.2546, The Reagan Bill of 1878, § 9, 9 Cong.Rec. 93 (1878-79), reprinted in L. H. Haney, II A Congressional History of Railways 297 (1908 & 1910) (reprinted two volumes in one by A. Kelly 1968) (hereinafter cited as Haney)
 
 
 [8]
 See Haney, supra note 7, at 292
 
 
 [9]
 See id. at 215-27
 
 
 [10]
 See id. at 34-38
 
 
 [11]
 See id. at 34
 
 
 [12]
 Id. at 37-38. There were, moreover, numerous statutes dealing with conditions and rates for transportation of the mails. See, e. g., Post Office Act, ch. 335, §§ 213, 214, 17 Stat. 309 (1872); Act of March 3, 1873, ch. 231, 17 Stat. 559; Act of July 12, 1876, ch. 179, 19 Stat. 79; Act of June 17, 1878, ch. 259, 20 Stat. 142 (1878); Act of Dec. 21, 1878, ch. 10, 20 Stat. 259; Act of March 3, 1879, ch. 180, 20 Stat. 357; Act of March 1, 1881, ch. 96, 21 Stat. 375; See Haney, supra note 7, at 200-213
 
 
 [13]
 For example, railroads in New Jersey are required to carry free of charge state employees who are traveling on state business. See N.J.Stat.Ann. § 48:12-109 (West Supp.1978)
 
 
 [14]
 See Haney, supra note 7, at 286-87
 
 
 [15]
 Section one states in relevant part:
 Free transportation for passengers prohibited; exceptions; penalty. No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees, its officers, time inspectors, surgeons, physicians, and attorneys at law, and the families of any of the foregoing; to the executive officers, general chairmen, and counsel of employees' organizations when such organizations are authorized and designated to represent employees in accordance with the provisions of the Railway Labor Act; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Homes, including those about to enter and those returning home after discharge; to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to railway mail-service employees and persons in charge of the mails when on duty and traveling to and from duty, and all duly accredited agents and officers of the Post Office Department and the Railway Mail Service and post-office inspectors while traveling on official business, upon the exhibition of their credentials; to customs inspectors, and immigration officers; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons:
 49 U.S.C. § 1(7).
 
 
 [16]
 See L. A. Miller, The Legislative Evolution of the Interstate Commerce Act 18, 280 (John Byrne & Co. 1930); ICC, Interstate Commerce Acts Annotated, Sen.Doc.No.166, 70th Cong., 1st Sess. Vol. 3 at 2699
 
 
 [17]
 See F. Judson, The Law of Interstate Commerce and Its Federal Regulation 294, § 179 (J. H. Flood & Co., Chicago, 3d ed. 1916)
 
 
 [18]
 See, e. g., Francis v. Southern Pacific Co., 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798 (1948); Charleston & Western Carolina R. Co. v. Thompson, 234 U.S. 576, 34 S.Ct. 964, 58 L.Ed. 1476 (1914); Boering v. Chesapeake Beach R. Co., 193 U.S. 442, 24 S.Ct. 515, 48 L.Ed. 742 (1904); Northern Pacific R. Co. v. Adams, 192 U.S. 440, 24 S.Ct. 408, 48 L.Ed. 513 (1904). See Judson, supra note 17, at 296, § 180
 
 
 [19]
 See C. Miller, The Legislative Evolution of the Interstate Commerce Act 257 (1930)
 
 
 [20]
 See Knorst, Interstate Commerce Law & Practice 89-90 (1953)
 
 
 [21]
 See id. at 104
 
 
 [22]
 See Act of August 9, 1916, ch. 301, 39 Stat. 441
 
 
 [23]
 Section 20(11) has been recodified without substantive change at 49 U.S.C. § 10730 (1978). See note 1 supra
 
 
 [24]
 Carriers are required to file tariffs and must adhere to those tariffs in order to prevent discrimination. See Essential Communications v. American Tel. & Tel., 610 F.2d 1114, 1119-20 (3d Cir. 1979)
 
 
 [25]
 Cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)
 
 
 [26]
 Cf. Strickland Transp. Co. v. United States, 334 F.2d 172 (5th Cir. 1964) (distinction between reduced and released rates under section 20(11) in context of U.S. bill of lading but section 22 not mentioned)
 
 
 [27]
 The Supreme Court held in Public Utilities Comm. of Calif. v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), that rates for the federal government were not subject to regulation by the states, and therefore the original holding of Hughes was incorrect