**EMERSON ELECTRIC SUPPLY COMPANY, Plaintiff**

v.

**ESTES EXPRESS LINES CORPORATION, Defendant.**

No. CIV.A. 03–0885.

United States District Court, W.D. Pennsylvania.

June 29, 2004.

Dennis J. Kusturiss, William A. Gray, Vuono & Gray, LLC, Pittsburgh, PA, for Plaintiff.

Lawrence J. Roberts, Coral Gables, FL, for Defendant.

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before this court are cross-motions for summary judgment filed by plaintiff Emerson Electric Supply Company ("plaintiff") and defendant Estes Express Lines Corporation ("defendant"). This action arises under the Carmack Amend-

ment to the Interstate Commerce Act, 49 U.S.C. § 14706, *et seq.* ("Carmack Amendment"). The Carmack Amendment imposes absolute liability upon a carrier for the value of goods lost or damaged during shipment, but it has a narrow exception that permits a carrier to limit its liability so long as the carrier meets certain requirements. 49 U.S.C. §§ 14706(a)(1), (c)(1)(A). Here, defendant, a motor carrier, delivered goods that plaintiff alleges were damaged while defendant was transporting them. The parties dispute whether defendant limited its liability in accordance with the Carmack Amendment. Specifically, the parties dispute whether defendant was required to provide plaintiff with an opportunity to choose between two or more rates and if so, whether defendant met that requirement.[1]

Defendant argues that its liability is limited to ten cents ($.10) per pound for the 10,200 pounds of electronic goods that it was carrying for plaintiff. In other words, defendant asserts that even if defendant is liable to plaintiff, defendant's liability is limited to a total of $1,020.00. Plaintiff, on the other hand, argues that defendant is liable for $155,190.80—the total value of the electronic goods, which plaintiff was shipping to a third-party customer. Plaintiff argues that defendant failed to limit its liability to the $.10 per pound because defendant failed to offer plaintiff the opportunity to choose between rates and to have an opportunity to pay a higher rate with a greater amount of liability coverage. Alternatively, plaintiff argues that if defendant's tariff limits defendant's liability, the "extraordinary value" tariff that expressly limits defendant's liability to $7.90 per pound (which in this case would result in defendant being liable in the amount of $80,580) should apply in this case. Plain-

tiff reasons that the actual value of the shipment was $158,360, and since that amount exceeds the released value rate that is set forth in the "extraordinary value" category, the "extraordinary value" tariff should apply.

Thus, the central issues raised by the parties' summary judgment motions and the oral argument that took place on April 29, 2004 before this court are:

(1) whether there is a material, factual dispute as to the condition of the electronic goods at the time that they were delivered to defendant carrier?

(2) whether the recent changes to the Carmack Amendment eliminated the requirement that defendant carrier must offer plaintiff shipper more than one rate?

(3) whether defendant carrier is required to offer plaintiff shipper more than one rate, did defendant carrier satisfy that obligation?

(4) whether defendant carrier satisfied the requirements for limiting its liability, which tariff item applies, i.e. the $.10 per pound or the $7.90 per pound?

The court finds that plaintiff failed to offer any evidence that the goods delivered to defendant carrier were in good condition at the time of their delivery. Therefore, plaintiff's motion for summary judgment (Doc. No. 12) is DENIED without prejudice. The court further finds that a carrier is required to provide a shipper with a fair opportunity to choose between two or more rates and defendant carrier failed to meet that obligation. Therefore, defendant's partial motion for summary judgment to limit liability (Doc. No. 10) is DENIED.

---

1. That opportunity for a shipper to choose between two or more rates is commonly referred to as the "fair opportunity require-

ment" or the "reasonable opportunity requirement." *See, infra,* at 724.

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

## Facts Not in Dispute For Purposes of Deciding the Motion

Plaintiff acts as a "middleman" and sells electrical supplies, equipment and parts produced by various manufacturers to its customers. Affidavit of Phil Picciotto ("Picciotto Aff.") ¶ 3.[2] Plaintiff works together with Electrical Component Sales, Inc. ("ECS") in the sale of electrical equipment to plaintiff's customers. *Id.* at ¶ 4. ECS is a manufacturer's representative that provides technical and engineering services in connection with the plaintiff's sale of electrical equipment to customers. *Id.* One example of a manufacturer that ECS represents is OEM Rowan, Inc. d/b/a Oil Field–Electric–Marine ("OEM Rowan"). Affidavit of Keith Rypczyk ("Rypczyk Aff.") ¶ 3.[3]

On or about September 12, 2002, a customer of plaintiff, Sharon Tube Company ("Sharon Tube"), placed an order with plaintiff for an OEM Rowan L.V. # 1 Switchgear, purchase price of $77,560, and OEM L.V. # 2 Switchgear, purchase price of $80,800 (the "switchgears"). The switchgears were sold for a total of $158,360. Picciotto Aff. ¶ 5. The shipping of the switchgears was arranged by Keith Rypczyk ("Rypczyk"), an employee for ECS, who provided consulting and engineering services in relation to the sale of the switchgears. *Id.* at ¶ ¶ 4, 6; Rypczyk Aff. ¶ 5.

On or about December 6, 2002, Rypczyk called defendant and requested a quotation for transportation of the switchgears. Rypczyk Aff. ¶ 14. Rypczyk informed defendant: (1) that there would be four pieces being shipped, (2) about the approximate dimensions of each piece, (3) about the approximate weight of each piece (2,500 pounds), and (4) that the items being shipped were electrical switchgears. *Id.* That same day, defendant sent Rypczyk a facsimile that included a quotation of $450.00 for the cost of shipping the switchgears from Houston, Texas to West Middlesex, Pennsylvania. Rypczyk Aff. ¶ 16; Joint Statement ¶ 17; Joint Exhibit 2.[4] Defendant and Rypczyk did not discuss

---

**2.** Phil Picciotto is the secretary of plaintiff, and his affidavit was filed at docket number 17.

**3.** Keith Rypczyck is an employee of Electrical Component Sales, Inc., and his affidavit was filed at docket number 16.

**4.** The Joint Statement, which includes facts on which the parties agree, and Joint Exhibits were filed at docket number 14. Evidently, the parties failed to provide all material, undisputed facts necessary for summary judgment in the joint statement as required by the court—later the parties filed three lengthy affidavits (Doc. Nos. 15 through 17). Page four of the Joint Statement is out of order and can be found behind Joint Exhibit 6.

a released value, limitations of liability, the value of the shipment, the manner in which the shipment was to be handled, defendant's tariffs, the preparation of the bill of lading, or insurance. Joint Statement ¶ ¶ 14, 16, 18, 19, 20, 21; Rypczyk Aff. ¶ 15, 17.

On January 6, 2003, Rypczyk sent a four-page facsimile to defendant, requesting defendant to transport the switchgears from Houston, Texas to Sharon, Pennsylvania. Rypczyk Aff. ¶ 19; Joint Statement ¶ 1. Pursuant to this request, on or about that same day, defendant picked up a shipment from OEM Rowan in Houston, Texas. Joint Statement ¶ 2. OEM Rowan prepared and signed a bill of lading, which designated the cosignee as "Chadderton Trucking c/o Sharon Tubing Co." in Sharon, Pennsylvania. *Id.* at ¶ 3; Joint Exhibit 1. The bill of lading listed OEM Rowan as the shipper and specified that the tariff classification of the shipment was class 77.5. Joint Exhibit 1. The bill of lading also contained a section that provided:

> Note: Where the rate is dependant on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding $—— per.

*Id.* OEM Rowan completed the bill of lading but did not fill in the blanks in the aforementioned section. Joint Statement ¶¶ 3, 11. ECS, who was working with plaintiff, through its employee, Rypczyk, was responsible for all of the shipping arrangements, including payment. Joint Statement ¶¶ 9–10.

The bill of lading form was a generic bill of lading selected by the shipper but not produced by defendant. Defendant, however, accepted the bill of lading as indicated by the application of defendant's pro

sticker onto the bill of lading. Joint Statement ¶ 8; Joint Exhibit 1; Affidavit of Albert D. Wilder, Jr. ("Wilder Aff.") ¶ 5.[5] Defendant's pro-sticker specifically states: "DRIVER'S SIGNATURE ACKNOWLEDGES RECEIPT OF FREIGHT ONLY. TERMS OF EXLA–105 RULES TARIFF APPLY." Joint Exhibit I. Defendant's tariff terms were available online at the time of the shipment at defendant's website, www.estes-express.com. Joint Statement ¶ 32.

The terms of "Tariff EXLA 105–H," which were in effect at the time plaintiff used defendant to ship goods to its customer, states at Item 848–15 that "Uncrated New Equipment and Machinery … will only be accepted for transportation when the Shipper releases the value of the property to a value not exceeding 10 cents per pound…." Joint Statement ¶ 30; Joint Exhibit 8. Specifically, the relevant portion of the defendant's Tariff 105–H at Item 848–15 provides:

> Item 848–15 RELEASED VALUE— USED EQUIPMENT AND MACHINERY OR UNCRATED NEW EQUIPMENT AND MACHINERY
>
> If the shipper fails or declines to release the value of the property to a value not exceeding 10 cents per pound, or designates a value exceeding 10 cents per pound, *shipment will not be accepted,* but if shipment is inadvertently accepted, it will be considered as being released to a value of 10 cents per pound and the shipment will move subject to such limitations of liability.

Joint Exhibit 8 (emphasis added). Notes A and B, which are applicable to Tariff 105–H at Item 848–15, state the following:

> NOTE A—Used Equipment or Machinery and/or *Uncrated New Equipment*

---

**5.** Albert D. Wilder, Jr. is the claims manager for defendant who maintains all of the company's freight claim files, and his affidavit was filed at docket number 11.

*or Machinery* is as listed in NMFC 100 series, including, but not limited to, the following:

Agricultural Implements;

Automobile Lifts;

Automobile Parts;

***Electrical Equipment;***

Machinery.

NOTE B—Applicable only on class rated shipments; except will not apply to those commodities named in NMFC 100 Series which provide specified Released Value provisions.

Joint Exhibit 8 (emphasis added). NMFC is an acronym for National Motor Freight Classification Tariff, and defendant is a participating carrier in the NMFC. Joint Statement ¶ 29; Joint Exhibit 7. The NMFC provides a definition of what constitutes crated equipment at Item 245, entitled "Definition Of Or Specification For Crates." Joint Exhibit 7. Nowhere in the record does plaintiff assert that the electrical switchgears were in crates.

Additionally, the terms of "Tariff EXLA 105–H" include at Item 350 a provision for the shipping of items classified as having extraordinary value—entitled "Articles of Extraordinary Value." Joint Statement ¶ 31; Joint Exhibit 9. Under that provision, if it is applicable, defendant's liability would be limited to a maximum value of $7.90 per pound because it was designated to be in Class 77.5 on the bill of lading. Joint Statement ¶ 37; Joint Exhibit 9. The Article of Extraordinary Value applies "[u]nless otherwise provided." Joint Exhibit 9.

On January 13, 2003, Rypczyk called defendant to find out the status of the shipment, and he learned that the truck carrying the shipment had been diverted to Louisiana. Rypczyk Aff. ¶ 23. Later that day, defendant called Rypczyk to inform him that the shipment would be delivered to Chadderton Trucking Company ("Chadderton") that same day. *Id.* Previously, Rypczyck arranged to have the shipment delivered to Chadderton and stored in its warehouse in Sharon, Pennsylvania because Sharon Tube was not yet ready to install the switchgears. *Id.* at ¶ 22.

Ultimately, on January 13, 2003 at approximately 11:35 a.m., the shipment was delivered at the facilities of Victor Printing in Sharon, Pennsylvania, which is located across the street from Chadderton. *Id.* at ¶¶ 24, 25; Affidavit of Billy O. Wheeler ("Wheeler Aff.") ¶ 4.[6] The shipment delivery occurred at the facilities of Victor Printing because Chadderton did not have a loading dock that was level with the back of defendant's truck. Joint Statement ¶ 24; Rypczyk Aff. ¶ 24; Wheeler Aff. ¶ 5. As a result, the shipment was unloaded at Victor Printing, transferred from defendant's truck to Chadderton's flatbed truck, secured, driven across the street to Chadderton, and unloaded in Chadderton's warehouse. Rypczyk Aff. ¶ 24; Wheeler Aff. ¶¶ 5–6. The shipment was not dumped, dropped, hit, abused and/or damaged during the time it was unloaded from defendant's truck through the time it came to rest in Chadderton's warehouse. Wheeler Aff. ¶ 6.

After the shipment was unloaded into Chadderton's warehouse, Billy O. Wheeler ("Wheeler"), a warehouse worker of Chadderton, noticed that the electrical controls were damaged and made a notation on the delivery receipt. *Id.* at ¶ 8. Defendant's truck, however, had already left when the damage was discovered; consequently, prior to the departure of defendant's delivery driver, no notation of damage or loss was

---

6. Billy O. Wheeler is a warehouse worker employed by Chadderton, and his affidavit was filed at docket number 15.

made on the delivery receipt, which was signed by Wheeler. *Id;* Joint Statement ¶ 25; Joint Exhibit 4. Wheeler did not initially notice the damage because the shipment was heavily wrapped in plastic shrink wrap. Wheeler Aff. ¶ 8.

Once the damage was noted, an employee of Chadderton called Rypczyk to inform him of the damage. *Id.* at ¶ 9. Wheeler was confident that the damage did not occur during the transfer from defendant's truck to Chadderton's truck or when the shipment was placed in Chadderton's warehouse. *Id.*

On January 13, 2003, Rypczyk observed the shipment, while it was still heavily shrink-wrapped, in Chadderton's warehouse, and he was able to see that the switchgears were damaged based upon his experience with such equipment. Rypczyk Aff. ¶ 25. That same day, Rypczyk obtained from Chadderton a claim form that had been forwarded to Chadderton by defendant. *Id.* at 27. Rypczyk partially completed the form and gave it to plaintiff, and plaintiff further completed the form. *Id.* Later, plaintiff forwarded the completed cargo claim form to defendant along with the required attachments, alleging damage to the subject shipment in the amount of $140,000. *Id;* Joint Statement ¶ 26; Joint Exhibit 5.

On January 15, 2003, MTI Inspection Services inspected the shipment and completed an inspection report. Joint Statement ¶ 27; Joint Exhibit 6. Once the inspector arrived, the shrink wrap was removed, and it was immediately apparent that the shipment was badly damaged. Rypczyk Aff. ¶ 26. The switchgears could not be repaired because they carry very high voltage and would be unsafe to use. *Id.* The switchgears were delivered to Voyten Electric/Electronics for $10,000, which was the reasonable salvage value of the damaged switchgears. Picciotto Aff. ¶ 16. As a result of the damage to the switchgears, Sharon Tube purchased new replacement switchgears on an expedited basis from OEM Rowan for $170,000. *Id.* at ¶ 17. All billings, shipment & payment were done directly between OEM Rowan and Sharon Tube. *Id.*

Sharon Tube sought reimbursement from plaintiff in the amount of $155,192.80, the amount which Sharon Tube originally paid to plaintiff for the switchgears—based upon an "early pay" discount. *Id.* at ¶¶ 17, 18. Plaintiff issued Sharon Tube a credit for $155,192.80 in exchange for Sharon Tube assigning plaintiff all salvage rights to the damaged switchgears and any and all claims and causes of action arising out the damage to the switchgears. *Id.* at ¶¶ 19–20. Thus, plaintiff claims it has been damaged in the amount of $145,192.80 ($155,192.80 less the $10,000 received for the salvage of the switchgears) and submitted a claim to defendant for that amount. *Id.* at ¶ 21. On March 5, 2003, defendant, however, responded to plaintiff's claims and stated that the tariff item, which covered the shipment, limits defendant's liability to ten cents ($.10) per pound; however, defendant expressed it was willing to make a compromise offer of $10,000. *Id.* at ¶ 22.

### Discussion

Plaintiff alleges that the basis for defendant's liability arises under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, for damaged cargo which was transported in interstate commerce by defendant. Defendant argues that the extent of its liability is limited to the terms of defendant's tariff, at Item 848–15, which applies to all uncrated new equipment and machinery. Plaintiff, however, contends that defendant failed to comply with one of the requirements for limiting its liability and therefore, defendant is responsible for the entire value of

the shipment. In sum, plaintiff argues that defendant failed to provide plaintiff with a fair opportunity to choose between two or more levels of liability because the language of defendant's tariff at Item 848–15 mandates that all shipments comprised of uncrated electrical equipment be released for a value of 10 cents per pound without exception.

First, the court will address whether there is a material fact in dispute with respect to the condition of the electronic goods at the time when they were delivered to the defendant. Second, the court's inquiry with regard to determining whether there is a limitation in the amount of liability begins with the statutory framework of the Carmack Amendment, which was initially enacted in 1906, the various changes to the Carmack Amendment, and the application of the Carmack Amendment prior to and following the statutory changes.

### I. Plaintiff did not provide evidence with respect to the condition of the electronic goods at the time that they were delivered to defendant carrier.

■ The Carmack Amendment created a "nationally uniform policy governing interstate carriers' liability for property loss." *New York, N.H. & Hartford R. Co. v. Nothnagle*, 346 U.S. 128, 131, 73 S.Ct. 986, 97 L.Ed. 1500 (1953). Under the statute, before a plaintiff may recover the actual value of goods, the plaintiff has the burden of proving the following three elements by a preponderance of the evidence: "(1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages." *Conair Corp. v. Old Dominion Freight Line, Inc.*, 22 F.3d 529, 531 (3d

Cir.1994). Thus, a plaintiff must provide reliable evidence, direct or circumstantial, that proves the condition of the goods by a preponderance of the evidence. *Beta Spawn, Inc. v. FFE Transp. Services, Inc.*, 250 F.3d 218, 225 (3d Cir.2001).

Plaintiff did not provide an affidavit stating that the shipment was undamaged at the time it was put in defendant's truck. April 29, 2004 Tr. at 14 and 21–22.[7] Plaintiff's counsel asserted that until plaintiff received defendant's reply brief, plaintiff was unaware that there was even a question as to whether the goods were damaged while in the possession of the carrier. At this time, because plaintiff failed to meet its burden of providing any reliable evidence with respect to the condition of the switchgears at the time that they were initially delivered to the carrier, the court denies plaintiff's motion for summary judgment without prejudice. The court will allow the parties to submit an additional motion for summary judgment on that issue.

### II. The recent changes to the Carmack Amendment did not eliminate the requirement that defendant carrier must offer plaintiff shipper the opportunity to choose between more than one rate.

■ At first glance, this issue appears to be one that the court can easily decide based upon the repeated recitation by the federal courts that "[f]ederal law requires that a carrier may limit its liability only if it ... give[s] the shipper a reasonable opportunity to choose between two or more levels of liability." *Carmana Designs v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991). *See also, infra*, at 724. The issue, however, is more complex because this requirement has

---

7. The transcript from the April 29, 2004 oral argument with respect to summary judgment

in the above-captioned case ("April 29, 2004 Tr.") can be found at docket number 25.

never been recited in any version of the Carmack Amendment. Rather, the requirement that a carrier must provide the shipper with a fair opportunity to choose between two or more levels of liability derives from common law. *Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314 (1913) (acknowledging the established common law rule); *Kemper Insur. Cos., Inc. v. Federal Express Corp.*, 115 F.Supp.2d 116, 122, 127 (D.Mass.2000), *aff'd.*, 252 F.3d 509, 515 (1st Cir.2001) (discussing the "fair opportunity requirement" as applicable under the Carmack Amendment's language in section 14706(c)(1) that "the value would be reasonable under the circumstances surrounding the transportation" and having the same contours as the "released value" doctrine under federal common law). Further complicating the issue is the inconsistent application of this doctrine. *See Hollingsworth & Vose Co. v. A–P–A Trans. Corp.*, 158 F.3d 617, 620–621 (1st Cir.1998) (discussing that there are about a dozen or so court of appeals cases that have addressed the "fair opportunity" question and describing the split regarding the adequacy of notice given to shippers of the carriers' rate options among the courts). Thus, the court examines the Carmack Amendment's history, recent amendments, and the reasoning behind the various federal courts' applications of the fair opportunity requirement.

## A. History of the Carmack Amendment and its Enactment

In 1887, Congress passed the Interstate Commerce Act,[8] regulating transportation; however, it contained no provision concerning liability of a carrier who lost or damaged goods. The Supreme Court found

that the Interstate Commerce Act of 1887 did not provide guidance on carrier liability. *Pennsylvania R.R. Co. v. Hughes*, 191 U.S. 477, 24 S.Ct. 132, 48 L.Ed. 268 (1903). *See Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1156–57 (3d Cir.1980), *cert. denied*, 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980). In 1906, in reaction to the *Hughes* decision, Congress passed what was popularly known as the Carmack Amendment to the Interstate Commerce Act, which created a nationally uniform policy governing an interstate carrier's liability.[9] The original Carmack Amendment did not contain a provision for variances in carrier liability based upon a choice of freight rates. 3 SAUL SORKIN, GOODS IN TRANSIT § 13.02, p. 13–16.1 (2004). It did make a carrier "liable to the lawful holder thereof for any loss, damage or injury such property caused by it." *Adams Express Co. v. Croninger*, 226 U.S. 491, 504, 33 S.Ct. 148, 57 L.Ed. 314 (1913) (listing the four significant and dominating features of the Carmack Amendment). *See also Howe*, 622 F.2d at 1157 (noting that the Carmack Amendment made an initial carrier responsible not only for the damage it caused but also for the damage caused by an interconnecting carrier).

In 1913, the United States Supreme Court found in a case dealing with the original Carmack Amendment that a carrier, which expressly limited its liability to no more than $50.00 unless the shipper declared a higher value in the bill of lading, was not liable for the full market value of the lost shipment—a diamond ring. *Adams Express Co. v. Croninger*, 226 U.S. at 512, 33 S.Ct. 148. In reaching this conclusion, the Court emphasized the following common law principle:

---

**8.** Act of Feb. 4, 1887, ch. 104, 24 Stat. 379.

**9.** What is popularly known as the Carmack Amendment, when first enacted, was actually

the Hepburn Act, Act of June 29, 1906, ch. 3591, 34 Stat. 584.

It has therefore become an established rule of the common law, as declared by this court in many cases, that such a carrier may, by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk.

*Id.* at 509–510, 33 S.Ct. 148. Thus, despite the language of the Carmack Amendment requiring absolute carrier liability, the Court found that under the common law, exceptions existed as long as the carrier met certain requirements—specifically, a carrier provided more than one rate to the shipper that is proportionate to the risk and the shipper agreed to the rate limiting liability of the carrier.[10] *Id.* at 509, 33 S.Ct. 148. *See also Howe,* 622 F.2d at 1157 (describing this holding as introducing the possibility that carriers could discriminate among shippers by offering reduced rates in exchange for real or imaginary limitation in declared value).

In 1915 and 1916, Congress further amended the Interstate Commerce Act via the Cummins Amendments,[11] which served to make a carrier liable for the "full actual loss or damage or injury" to the property and required that rates dependent upon the value of the property be filed as part of a tariff with the Interstate Commerce Commission (the "ICC"). *Howe,* 622 F.2d at 1157. Under these amendments, so long as the ICC authorized a carrier's rate as reasonable, the carrier could charge rates for the transportation of the cargo that would enable the carrier to limit its liability to the amount agreed to in writing between the carrier and a shipper. 3 SAUL

SORKIN, GOODS IN TRANSIT § 13.02, p. 13–18 (2004). That rate is often referred to as the "released rate" and the agreed value is often called the "released value." *Id.*

Thus, the Cummins Amendments specifically modified the Carmack Amendment to allow a carrier to limit its liability provided the carrier took certain actions; thus, Congress endorsed the *Adams Express* rule. *See* 3 SAUL SORKIN, GOODS IN TRANSIT § 13.02, p. 13–16.1, n. 6 (2004) (citing *Howe,* 622 F.2d at 1156–57). The common law principles relating to liability of interstate carriers have been said to have been incorporated into the Carmack Amendment. *See Tokio Marine & Fire Ins. Co. v. Amato Motors,* 996 F.2d 874, 876 (7th Cir.1993) ("Congress incorporated common law principles relating to liability of interstate carriers in the Carmack Amendment to the Interstate Commerce Act.").

**B. The relevant, recent revisions to the Interstate Commerce Act**

Since 1978, Congress passed numerous revisions to the Interstate Commerce Act. In 1978, Congress enacted a law that revised and codified provisions of the Interstate Commerce Act and related laws at subtitle IV of Title 49, United States Code, Transportation. Pub.L. No. 95–473, § 3, 92 Stat. 1466 (Oct. 17, 1978). While Congress expressly stated that it sought only to restate the already existing law without substantive changes, there were some changes in wording and structure that undoubtedly affected interpretations of the Interstate Commerce Act. 3 SAUL SORKIN, GOODS IN TRANSIT § 13.02[1], p. 13–18 (2004).

---

**10.** In *Adams Express,* the two rates available to the shipper were 25 cents if the package's value was $50.00 or less and 55 cents if its value was $125.00. 226 U.S. at 493, 33 S.Ct. 148.

**11.** Act of Mar. 4, 1915, ch. 176, 38 Stat. 1196, Act of August 9, 1916, ch. 301, 39 Stat. 441.

The next major change to the Interstate Commerce Act was the Motor Carrier Act of 1980, which gave motor common carriers of non-household goods increased flexibility in terms of determining whether to offer released rates at reduced liability. Pub.L. No. 96–296, 94 Stat. 793, July 1, 1980, § 12, amending 49 U.S.C. § 10730 (prior to Jan. 1, 1996). In hopes of increasing competition and reducing regulation, Congress allowed carriers of non-household goods to establish released rates without the prior approval of the ICC. *See Shippers Nat'l Freight Claim Council v. Interstate Commerce Commission,* 712 F.2d 740, 742 (2nd Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). Motor carriers of non-household goods, however, were restricted to only use released rates that were "reasonable under the circumstances," and the ICC was given the power to require a carrier to have in effect "a rate for such service which does not limit the liability of the carrier." *Id.* at 743 (citing 49 U.S.C. § 10730(b)). *See also Nat'l Small Shipments Traffic Conference, Inc. v. United States,* 887 F.2d 443, 446 (3d Cir.1989) (approving the ICC's conclusion that carriers could limit liability by providing "inadvertence clauses" on the bill of lading on which a shipper could declare the freight's value or be subject to the lowest rate permitted in the tariff and pay the lowest rate permitted in the tariff).

Congress' implementation of two laws in 1994 and 1996 further impacted the Carmack Amendment. The first of these two laws, the Trucking Industry Regulatory Reform Act of 1994 ("TIRRA"), Pub.L. No. 103–311, tit. II, § 206, 108 Stat. 1673, 1684–85, went into effect on August 26, 1994.[12] The TIRRA eliminated the requirement that carriers of non-household

goods had to file tariffs with the ICC, 49 U.S.C. §§ 10702 and 10730. The second law, the Interstate Commerce Commission Termination Act of 1995 ("ICCT Act"), Pub.L. No. 104–88, tit. I, § 103, ch. 147, sec. 14706, 109 Stat. 907–10, went into effect January 1, 1996, and revised, recodified and replaced the former Carmack Amendment. 49 U.S.C. § 14706, *et seq.*

## C. The TIRRA and ICCT Act's impact on carrier liability

■ Prior to the TIRRA and the ICCT Act, the Carmack Amendment provided the following in relevant part with respect to carrier liability:

(a) The Interstate Commerce Commission may . . . authorize a carrier . . . to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement. . . .

(b)(1) Subject to the provisions of paragraph (2) of this subsection, *a motor common carrier . . . may, subject to the provisions of this chapter . . . establish rates for the transportation of property . . . under which the liability of the carrier . . . for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier . . . and shipper if that value would be reasonable under the circumstances surrounding the transportation.*

(2) Before a carrier or freight forwarder may establish a rate for any service under paragraph (1) of this subsection, the Commission may require such carrier or freight forwarder to have in effect and keep in effect, during any

---

**12.** A review of Public Law No. 103–311 reveals that all of the TIRRA went into effect on August 26, 1994, with the exception of sections 207 and 208, which went into effect on January 1, 1998.

period such rate is in effect under such paragraph, a rate for such service which does not limit the liability of the carrier or freight forwarder.

49 U.S.C. §§ 10730(a), (b) (emphasis added). Under this language courts traditionally only allowed a carrier to limit its liability if the carrier met a four-factor test. *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir.1987). If the carrier failed to meet the four-step test, the carrier, pursuant to 49 U.S.C. § 11707(a)(1), was liable under the general rule for the actual loss or injury to the property. The four-step test placed the burden of proof on the carrier, to prove that it:

> (1) maintained a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtained the shipper's agreement as to its choice of liability; (3) gave the shipper a reasonable [or fair] opportunity to choose between two or more levels of liability; and (4) issued a receipt or bill of lading prior to moving the shipment.

*American Cyanamid Co. v. New Penn Motor Express, Inc.,* 979 F.2d 310, 313 (3d Cir.1992); *Carmana Designs v. North American Van Lines,* 943 F.2d 316, 319 (3d Cir.1991); *Kansas City Fire & Marine Ins. Co. v. Consolidated Rail Corp.,* 80 F.Supp.2d 447, 450 (E.D.Pa.1999). *See also Toledo Ticket Co. v. Roadway Express,* 133 F.3d 439, 442 (6th Cir.1998); *Rohner Gehrig Co. v. Tri–State Motor Transit,* 950 F.2d 1079, 1082 (5th Cir. 1992); *Bio–Lab, Inc. v. Pony Express Courier Corp.,* 911 F.2d 1580, 1582 (11th Cir.1990); *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 107 (1st Cir. 1978).

Following Congress' passage of the TIRRA and the ICCT Act, federal courts disagreed on whether the new laws changed the applicable requirements for a carrier to limit liability. *Compare Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.,* 331 F.3d 834, 842 (11th Cir. 2003), and *Kemper Insur. Cos., Inc. v. Federal Express Corp.,* 115 F.Supp.2d 116, 126–127 (D.Mass.2000), *aff'd,* 252 F.3d 509, 515 (1st Cir.2001), *with Penske Logistics, Inc. v. KLLM, Inc.,* 285 F.Supp.2d 468, 475 (D.N.J.2003), *EFS Nat'l Bank v. Averitt Express, Inc.,* 164 F.Supp.2d 994, 1001 (W.D.Tenn.2001), and *Nieman Marcus Group, Inc. v. Quast Transfer, Inc.,* 1999 WL 436589 at *4 (N.D.Ill. June 21, 1999).

Interestingly, courts appear to agree that the current version of the Carmack Amendment addressing a carrier's ability to limit its liability is "identical in all material respects in the current and previous versions of the Carmack Amendment." *Sassy Doll Creations, Inc.,* 331 F.3d at 841. *See also EFS National Bank,* 164 F.Supp.2d at 1000 (describing the current version of the Carmack Amendment that allows limitations to a carrier's liability as "nearly identical to the pre–1996 version"). The current version of the Carmack Amendment provides in relevant part:

> **§ 14706. Liability of carriers under receipts and bills of lading**
>
> **(a) General liability.—**
>
> **(1) Motor carriers and freight forwarders.**—A carrier providing transportation ... shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported....

\* \* \*

**(c) Special rules.—**

    **(1) Motor carriers.—**

        **(A) Shipper waiver.—**Subject to the provisions of subparagraph (B), *a carrier providing transportation ... may, subject to the provisions of this chapter ... establish rates for the transportation of property ... under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.*

49 U.S.C. § 14706(a),(c)(1)(A) (emphasis added).[13] Thus, under this nearly identical language to the pre–1996 Carmack Amendment, the same general rule applies—a carrier of property in interstate commerce that damages a shipment is liable "for the actual loss or injury to the property caused by" the carrier (*compare* 49 U.S.C. § 14706(a)(1) *with* 49 U.S.C. § 11707(a)(1)), and the carrier continues to be able to limit its liability provided it meets certain requirements including that value to which the shipper is limited is "reasonable under the circumstances surrounding the transportation." *Compare*

49 U.S.C. § 14706(c)(1)(A) *with* 49 U.S.C. § 10730(a), (b).

One new provision to the Carmack Amendment, that appears to be creating some debate among the federal courts, immediately follows section 14706(c)(1)(A) and provides:

        **(B) Carrier notification.—**If the motor carrier is not required to file its tariff with the Board, it shall provide under section 13710(a)(1) to the shipper, *on request of the shipper,* a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based. The copy provided by the carrier shall clearly state the dates of applicability of the rate, classification, rules, or practices.

49 U.S.C. § 14706(c)(1)(B) (emphasis added).[14] The primary function of this new section is to require a carrier to provide a shipper with the carrier's tariff if the shipper requests it instead of requiring the carrier to file its tariff with the now-defunct ICC. *See Sassy Doll Creations*, 331 F.3d at 841 (citing *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1063 (7th Cir. 2000) (applying 49 U.S.C. § 14706 with the same four-part test that was used prior to post–1996 statutory change)).

---

**13.** The pre–1996 version of the Carmack Amendment, which is comparable to 49 U.S.C. § 14706(a), provided:

    **§ 11707. Liability when property is delivered in violation of routing instructions** (a)(1) A common carrier providing transportation ... shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. The carrier and any other common carrier that delivers the property and is providing transportation ... are liable to the person entitled to recover under the receipt of bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported....

**14.** Section 13710(a)(1), which is referenced in section 14706(c)(1)(B), provides in relevant part:

    **(a) Miscellaneous provisions.—** **(1) Information relating to a basis of rate.—**A motor carrier of property ... shall provide to the shipper, on request of the shipper. A written or electronic copy of the rate, classification, rules and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based.

■ Some courts, however, have noted that based upon this section and the changes in the law, it is unclear whether a carrier still has to meet the requirements of the traditional four-factor test. *Penske Logistics, Inc.*, 285 F.Supp.2d at 475; *EFS Nat'l Bank*, 164 F.Supp.2d at 1001; *Nieman Marcus Group, Inc.*, 1999 WL 436589 at *4. Specifically, these courts have questioned whether a carrier still has to obtain the shipper's agreement as to its choice of liability and give the shipper a reasonable opportunity to choose between two or more levels of liability. *See Penske Logistics, Inc.*, 285 F.Supp.2d at 475 (finding that "the requirement that a shipper choose between two levels of liability is inapplicable" because the shipper drafted the bill of lading, which was a valid written contract, stating that the declared value was not to exceed $1.50 per pound, and the shipper received a rate schedule prior to completing the bill of lading); *EFS Nat'l Bank*, 164 F.Supp.2d at 1001 ("It is unclear whether the second and third requirements, that the carrier must give the shipper a fair opportunity to choose between two or more levels of liability and that the carrier must obtain the shipper's written agreement as to choice of liability, should still apply."); *Nieman Marcus Group, Inc.*, 1999 WL 436589 at *4 ("it is unclear whether providing a reasonable opportunity to choose between levels of liability should still be a requirement for enforcing a limitation liability").[15]

Arguably, the deletion of the statutory language that the ICC may require a carrier to have a rate that does not limit the liability of the carrier, formerly found in section 10730(b)(2), indicates that carriers no longer need to offer a full value rate.

The requirement to offer two options under the fair opportunity doctrine, however, has never meant that a carrier must provide a shipper with a full value rate. *Kemper Insur. Cos., Inc. v. Federal Express Corp.*, 252 F.3d 509, 513 (1st Cir.2001) (holding that the fair opportunity doctrine was met when the shipper had the option of choosing between two amounts—$100 or $500 of liability coverage even though the undelivered jewelry both was valued at considerably higher amount) (multiple citations omitted). Thus, Congress' elimination of section 10730(b)(2) cannot be read to mean that Congress intended to eliminate the requirement that there be at least two options—it only eliminated the ability of the ICC, which is now defunct, from requiring a carrier to offer a full value rate.

The United States Court of Appeals for the Third Circuit has not addressed this issue since the TIRRA and ICCT Act went into effect. The United States Court of Appeals for the Eleventh Circuit in *Sassy Doll Creations*, 331 F.3d at 842, however, provides persuasive guidance, and this court concludes that the fair opportunity requirement that a carrier has to provide a shipper with a reasonable opportunity to choose between more than one rate remains intact.

In *Sassy Doll Creations*, the court found that other than the fact that a carrier no longer has to file its tariffs with the ICC, the new provision to the Carmack Amendment did not alter the other parts of the historic four-part test. 331 F.3d at 842 Thus, the court concluded that carriers are still required to provide shippers a reasonable opportunity to choose between differ-

---

**15.** It appears that since the passage of the TIRRA and the ICCT Act, some courts have used the terms "rates" and "liability coverage" interchangeably with respect to the "fair opportunity requirement." The court notes that from a business perspective, it would seem that a greater liability coverage would correspond to a higher rate that a shipper pays.

ent levels of liability. *Id.* ("Nothing about the change is inconsistent with the half-century old reasonable opportunity requirement."). In particular, the court reasoned that:

> "Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend," and "[w]here there is no indication that Congress intended to change the meaning courts have given to the statute, we are to presume that it did not intend any such change." *Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 232 F.3d 854, 859–60 (11th Cir.2000). The statutory language concerning liability "limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper," 49 U.S.C. § 14706(c)(1)(A), is identical in all material respects in the current and previous versions of the Carmack Amendment.

*Id.* at 841. This reasoning is further supported by the fact that the reasonable opportunity requirement has been applied under the Carmack Amendment since at least 1913. *Adams Express Co. v. Croninger*, 226 U.S. at 504, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *see New York, N.H. & Hartford R. Co. v. Nothnagle*, 346 U.S. 128, 135–135, 73 S.Ct. 986, 97 L.Ed. 1500 (1953) ("But only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained.") (multiple citations omitted); *First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1116–1117 (3d Cir.1984) ("There must be a *bona fide* alternative enabling the shipper to declare a higher valuation upon paying a higher rate, in order for the carrier to limit its liability to the released value at a lower rate.") (citation omitted). *See also Sassy Doll Creations*, 331 F.3d at 841 (noting that the reasonable opportunity requirement "has been part of the Carmack Amendment jurisprudence for at least the past fifty years ... and has been applied throughout the circuits since that time") (multiple citations dating back to 1953 omitted); *Kesel v. United Parcel Service, Inc.*, 339 F.3d 849, 852 (9th Cir.2003) (continuing to note the requirement that the carrier has to provide the shipper with "(1) reasonable notice of limited liability, and (2) a fair opportunity to purchase higher liability") (citations omitted); *Hollingsworth & Vose Co. v. A–P–A Trans. Corp.*, 158 F.3d 617, 620 (1st Cir.1998) (noting that the "fair opportunity" language "has taken on a life of its own, and later circuit cases have treated the rubric almost as if it were an independent requirement of the Carmack Amendment").

Additionally, it makes sense that this requirement would continue, making the "constraints on limitation clauses ... the same for motor carriers covered by the Carmack Amendment as they are for air carriers covered by the released value doctrine." *Kemper Insur. Cos., Inc. v. Federal Express Corp.*, 252 F.3d 509, 514 (1st Cir.2001). This is particularly true since the revised Carmack Amendment, at section 14706(c)(1)(A), still requires the "agreement between the carrier and shipper [to be for a] value [that] would be reasonable under the circumstances surrounding the transportation," and the Court of Appeals for the First Circuit indicated that reasonableness is met if the agreement between the shipper and carrier provides "a reasonable opportunity to choose between the regular rate and a rate reflecting a higher level of liability." *Id.* at 515.

Lastly, it is of some consequence to note that the **general rule** under the Carmack Amendment has always been that a carrier is liable for the actual value of the lost or

damaged property. *Rohner Gehrig Co., Inc. v. Tri–State Motor Transit,* 950 F.2d 1079, 1083 (5th Cir.1992) ("When [Congress] adopted the Carmack Amendment eighty-five years ago, Congress expressed a public policy against limitation of liability by carriers"). Like any exception to a public policy, the exception is to be construed narrowly. *Id.* Thus, to ensure that the exception does not swallow the rule, a carrier should be required to offer at least two liability options in order to ensure that the shipper's agreement was well informed and deliberate. *Nothnagle,* 346 U.S. at 135–136, 73 S.Ct. 986 (asserting the need for shippers to have a choice because "[b]inding respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice"); *Carmana Designs v. North American Van Lines, Inc.,* 943 F.2d 316, 320 (3d Cir.1991) ("A reasonable opportunity to choose different levels of coverage means that the shipper had both reasonable notice of the liability and the opportunity to obtain information necessary to making *a deliberate and well informed choice.*") (internal quotations and citations omitted) (emphasis added).

### III. Defendant carrier failed to satisfy its obligation to provide plaintiff shipper with a fair opportunity to choose between more than one rate of liability.

Defendant asserted in its original brief filed on February 19, 2004, and again in its brief filed on March 19, 2004, that defendant obtained the plaintiff's agreement as to its choice of liability and gave plaintiff a reasonable opportunity to choose between two or more levels of liability consistent with the test in *Am. Cyanamid Co. v. New Penn Motor Express, Inc.,* 979 F.2d 310, 313 (3d Cir.1992). Specifically, defendant asserted that it met these requirements by "the presence of a declared value box on the bill of lading." At oral argument, how-ever, defendant shied away from that argument and for the first time, raised the aforementioned issue of whether defendant had an obligation to provide defendant with a reasonable opportunity to choose between two or more levels of liability. April 29, 2004 Tr. at 10. Defendant's doing so was reasonable given that even if the declared value box had been filled in under defendant's tariff there would not have been greater coverage—in other words, the declared value box was meaningless under the tariff.

■■ The court now focuses on defendant's other argument that plaintiff could have chosen a higher rate "if the shipment had been packaged in a crate" and that defendant has a right to demand that expensive goods be packed properly in order for a shipper to receive a higher released value. *Id.* at 10–11. In other words, defendant argues that plaintiff had two options as to its liability coverage—they are simply dependant upon how plaintiff packaged the electrical equipment for shipment—whether it is crated or uncrated. At first glance, this argument has some appeal. After all, a shipper is charged with constructive knowledge of the contents of a carrier's tariff so that if the tariff has two rate schedules with higher and lower liability corresponding to a greater or lesser charge, the shipper is deemed to have an opportunity to have chosen between rates. *First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1116–1117 (3d Cir.1984). *See also Flying Tiger Line, Inc. v. Pinto Trucking Service, Inc.,* 517 F.Supp. 1108, 1114 (E.D.Pa.1981) ("The shipper, however, is charged with knowledge of the terms, conditions, regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged the carriage of goods.").

Furthermore, there are numerous cases in which courts have held shippers, who prepared the bill of lading or had their agents prepare the bill of lading, to have constructive knowledge of and assent to the terms of a tariff where the shipping contract "was negotiated between people of at least equal economic stature and commercial awareness or acuity." *Asset Management & Control, Inc. v. ABF Freight System, Inc.*, 18 F.Supp.2d 187, 192 (N.D.N.Y.1998) (internal citations and quotations omitted). *See also Am. Cyanamid Co. v. New Penn Motor Express, Inc.*, 979 F.2d 310, 314 (3d Cir.1992) (noting the conspicuous dark type on the bill of lading that provided two liability rates and stated that "[t]he released value was specified on [the shipper's] own form of bill of lading"); *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 612 (9th Cir.1992) (emphasizing that the shipper "drafted the contract and directly negotiated its terms"); *Mech. Tech. Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1086 (2d Cir.1985) (describing the bill of lading as "one of [the shipper's] own forms"). These courts look to factors such as "a shipper's sophistication, abundant experience, or extensive prior dealings with a carrier" as additional evidence of a limitation agreement. *Carmana Designs*, 943 F.2d at 321. *See also Kemper Insur. Cos., Inc.*, 115 F.Supp.2d at 124 (noting that courts often examine the following to determine if a carrier effectively limited its liability: (1) adequate notice of the limitation, (2) sophistication of the parties, (3) the availability of "spot" insurance to cover a shipper's exposure).

In this case, the factors that courts commonly examine to determine whether a carrier limited its liability weigh in favor of defendant. While it is unclear who produced the generic bill of lading form,[16] it was completed and signed by plaintiff shipper's agent (OEM Rowan). Joint Statement ¶¶ 8–11. Plaintiff shipper, which is in the business of selling electrical supplies, equipment and parts to customers, is sophisticated and experienced in shipping its products to its customers.[17] Picciotto Aff. ¶ 3. There is, however, no evidence that plaintiff shipper had a prior course of dealings with defendant carrier or that plaintiff shipper was actually aware of the liability limitations in defendant carrier's tariff. Based upon these facts, if this was simply a contract case, the court would not hesitate to find that plaintiff shipper is bound by the written agreement that it entered when it signed the bill of lading, which referenced defendant carrier's tariff—albeit the reference to the tariff is somewhat inconspicuous. Joint Exhibit 1.

This case, however, is not a simple contract case. As plaintiff argued it its brief and at oral argument, defendant is required to provide plaintiff with a fair opportunity to choose between two or more rates for different levels of liability coverage. Defendant's tariff, however, regardless of whether plaintiff declared a value on the bill of lading, limited its liability to $.10 per pound, providing plaintiff no opportunity to choose an alternative rate or a different level of liability coverage. Joint Exhibit 8 (stating that shipment of uncrated new equipment "will be accepted for transportation only when the shipper releases the value of the property to a value not exceeding 10 cents per pound per article").

The plain language of defendant's tariff strays from the United States Supreme

---

16. At oral argument, counsel for the parties told the court that it appeared that the shipper obtained the form and filled it out. April 29, 2004 Tr. at 3.

17. At oral argument, plaintiff's counsel conceded that the plaintiff manufacturing company is not an unsophisticated shipper. April 29, 2004 Tr. at 20–21.

Court's description of what constitutes a fair opportunity to choose between "higher or lower liability by paying correspondingly greater or lesser charge" because plaintiff was neither given a choice of paying a higher price to ship the uncrated electrical equipment nor given an opportunity under the terms of the tariff to choose a higher level of liability coverage.[18] *Nothnagle*, 346 U.S. at 135–135, 73 S.Ct. 986; *Adams Express Co.*, 226 U.S. at 504, 33 S.Ct. 148 (describing the common law rule of proportioning the rates according to the amount of risk). *See also Carmana Designs*, 943 F.2d at 320 (stating that a bill of lading that provided the shipper with three choices of coverage when accompanied by specific information regarding the different costs of the several options would ordinarily be sufficient to provide the shipper with a reasonable opportunity to decide between levels of coverage); *Converting Systems Inc. v. Hot–Line Freight System, Inc.*, 344 Ill.App.3d 1037, 279 Ill.Dec. 863, 801 N.E.2d 155, 161 (2003) (holding that when the bill of lading was silent on its face to liability coverage options, it is unclear whether the shipper agreed to a limitation contained in the carrier's tariff and distinguishing the facts of *EFS Nat'l Bank*, 164 F.Supp.2d at 1001, and *Nieman Marcus Group, Inc.*, 1999 WL 436589 at *4, because the bill of ladings in those cases contained specific language imposing limitations of liability). Rather, plaintiff was given a flat rate for the cost of the shipment—$450.00 and a flat level for the liability coverage—$.10 per pound. Ryp-

czyk Aff. ¶ 16; Joint Statement ¶ 17; Joint Exhibit 2.

In *First Nat'l Bank & Trust Co. v. Consolidated Freightways*, 797 F.Supp. 1262, 1274 (E.D.Pa.1992), the defendant carrier asserted that plaintiff shipper was limited to the liability in its tariff; however, the court held, relying in part on *Emily Shops, Inc. v. Inter–State Truck Line, Inc.*, 207 Misc. 557, 139 N.Y.S.2d 561 (1955), *aff'd*, 2 N.Y.2d 405, 161 N.Y.S.2d 46, 141 N.E.2d 560, *cert. denied*, 355 U.S. 827, 78 S.Ct. 36, 2 L.Ed.2d 40 (1957), and *Acro Automation Systems v. Iscont Shipping Ltd.*, 706 F.Supp. 413 (D.Md.1989), that defendant carrier failed to limit its liability because it billed plaintiff shipper a flat monthly fee of $412.57 that was in no way related to the tariff rate schedule or the value of the property that plaintiff was shipping. This court finds that court's reasoning persuasive. *Id.* at 1270–71 ("When the amount charged is not a tariff rate, dependent on the value of the property, but a flat amount, bearing no discernible relationship to the tariff rate schedule, the shipper is not given a reasonable opportunity to choose between higher and lower rates."). *See also Emily Shops, Inc.*, 207 Misc. at 559, 139 N.Y.S.2d 561 (holding that plaintiff was charged a flat rate and therefore, "there is actually no choice of rates, the liability limitations of the statute do not apply").

As noted above the fair opportunity requirement is crucial to ensuring that a shipper makes a well informed, deliberate choice, and it is consistent with Congress'

---

**18.** Because defendant failed to provide plaintiff with either an option as to two rates or to two choices of liability, the court does not address the issue of whether two choices of liability coverage is sufficient with respect to the carrier's ability to limit liability to meet the implicit requirement of the Carmack Amendment. The court questions, however, based upon the variations among federal

courts' application of the fair opportunity requirement whether the Carmack Amendment provides a national, uniform standard governing the interstate shipment of goods. A survey of court opinions in this area shows a lack of uniformity as to the circumstances under which a carrier will be found to have limited its liability.

intent that the general rule would be to hold carriers liable for actual property damage or loss because carriers are generally in the best position to prevent such damage and loss as well as to make it part of their cost of doing business. *Acro Automation Systems,* 706 F.Supp. at 416 (finding there was no evidence that the shipper was offered a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge where plaintiff paid a flat rate). Because plaintiff was not provided with an opportunity to choose between two or more rates or, at a minimum, between two or more liability coverage options, this court holds that defendant failed to limit its liability in accordance with the requirement that a shipper be given a fair opportunity to choose between two or more rates or between two or more levels of liability coverage.

IV. **Because defendant carrier failed to satisfy the requirements for limiting its liability, the court need not determine which tariff item applies, i.e. the $.10 per pound or the $7.90 per pound.**

Based upon the court's finding that defendant failed to provide plaintiff with options for more than one rate, it is unnecessary for the court to address the last issue raised by plaintiff regarding the ambiguity of defendant's tariff and the possibility of applying the "extraordinary value" tariff—it is clear that the only shipping rate offered to plaintiff was $450.00 based upon the description that plaintiff's agent provided to defendant and the only available liability coverage was $.10 per pound for plaintiff's uncrated switchgears.

### Conclusion

After consideration of the various submissions by the parties and oral argument, plaintiff's motion for summary judgment (Doc. No. 12) is DENIED without prejudice for the parties to submit additional information on the issue of the condition of the electrical switchgears, and defendant's motion for partial summary judgment (Doc. No. 10) is DENIED because the court finds that defendant failed to limit its liability under the Carmack Amendment.